THOMPSON *et al.* v. THE SAM BROWN *et al.*

*(District Court, W. D. Pennsylvania. March 17, 1891.)*

SEAMEN—DISCHARGE—PORT OF SHIPMENT.
 Where libelants shipped as deck-hands on a steam-boat at Cincinnati, without any agreement as to the duration of the voyage, the port of its termination, or their discharge, the legal presumption is that they are to be returned to the port of shipment, and, if upon their arrival at Pittsburgh they are discharged, they are all entitled, except one whose residence is Pittsburgh, to compensation for their time and expense in returning to Cincinnati, irrespective of the fact that Pittsburgh is the home port of the boat.

In Admiralty.
*Albert York Smith*, for libelants.
*George W. Acklin*, for respondents.

REED, J.   The libel in this case was filed by eight of the crew of the steam-boat Sam Brown, alleging that all of their number (except W. P. Green, who was employed by the captain,) were hired, on January 12, 1891, by the mate, as deck-hands, at Cincinnati, to proceed on the voyage of the boat to Pittsburgh, and return to Cincinnati, and were each to be paid at the rate of $40 per month; that on the arrival of the boat at Pittsburgh, on January 19, 1891, the libelants were discharged, and their wages paid only for the time occupied in the trip from Cincinnati to Pittsburgh; that they demanded to be returned to Cincinnati, and were willing and ready to complete the voyage; that there was no written contract or shipping article with any one of the libelants.   They claim their railway fare from Pittsburgh to Cincinnati, as well as wages at the rate of $40 per month for the time required to go to Cincinnati.   The answer admits the hiring and date of shipment; denies that there was any understanding that the libelants were to be returned to Cincinnati; and avers that it was expressly agreed and understood that they were to be discharged and paid off wherever the voyage should terminate, without further allowance or compensation; and admits that they were paid only to Pittsburgh, which was the express understanding, as they aver.   The testimony is exceedingly conflicting.   The libelants' and respondents' witnesses agree in nothing essential, except dates and rate of wages to be paid, but differ as to what was said both at the time the libelants were hired and afterwards.   The burden of proof, however, is on the respondents to prove the agreements claimed to have been made by the mate and captain with those of the libelants they respectively employed; and I hesitate the less in the application of this rule, because it was entirely practicable to have made a written agreement with the libelants in regard to the period and voyage for which they were employed, about which there would have been no uncertainty or dispute.   I find, therefore, after a consideration of the whole testimony, the following to be the facts as supported by the weight of evidence:

The Sam Brown is a steam tow-boat having its home port at Pittsburgh, and engaged at this time in the navigation of the Ohio river between Pittsburgh and Cincinnati.   It had made a voyage from Pittsburgh to Cincinnati with a tow of coal, and on the 12th of January was ready to return to Pittsburgh.   Seven of the libelants were hired by the mate at different times during the morning, and were put to work.   Nothing was said or agreed upon at the time of their employment as to the duration of the voyage, or the port of its termination, or their discharge.   The only thing agreed upon was that their wages would be at the rate of $40 per month.   W. P. Green, one of the libelants, was employed during the morning by the captain, and nothing was said or agreed upon as to the duration of the voyage, or the port of its termination, or his discharge. All of these libelants, except Michael Hawkins, are, or are entitled to be

considered, residents of Cincinnati. Hawkins is a resident of Pittsburgh, and was working his way home, having been sick in the hospital at Cincinnati. The men continued their work until about noon, when, either just before or just after the boat got under way, they were called to the forecastle, and were all there except John Doyle, one of the libelants. The mate addressed them. There is a conflict as to what he said; he testifying that he said they would be discharged whenever the boat laid up, and no fare back would be paid,—in which he is corroborated by the captain and two other witnesses. Six of the libelants testify that he told the men "he did not want any fussing or wrangling on the boat," and that "they would give us $40 per month, and do better if they could," and they testify that he said nothing about discharge or fares. In my opinion, this is not a material matter. The libelants had been employed some hours before, and had done some work about the boat in pursuance of their employment, and no subsequent declarations or statements of the mate could change the relations of the parties. Nor is it material whether the mate said, after the libelants were employed and during the voyage, that the boat would return to Cincinnati if there was water enough. He had no control over the future movements of the boat, and his statements in that respect are not binding or material. Upon the arrival of the boat at Pittsburgh, on January 19th, the libelants were paid off and discharged. At that time they demanded their fare back to Cincinnati, which was refused by the captain, and this libel was thereupon filed.

Upon this finding of facts, the question in the case is whether these libelants, having shipped at Cincinnati without any agreement as to the duration of the voyage, or the port of its termination, or their discharge, seven of them are entitled to be returned at the expense of the vessel from Pittsburgh, the home port of the boat, to Cincinnati, the place of shipment, and the home, for the purposes of this case, of seven of the libelants. In any event, the libelant Hawkins cannot recover, as Pittsburgh was his home, and he cannot claim the right to be returned to Cincinnati. *Rogers* v. *Lewis*, 1 Low. 297.

It was held in the case of *Worth* v. *Lioness*, 3 Fed. Rep. 923, that "a mariner who ships for a voyage cannot be discharged without cause in a foreign port without the known legal results. Where there are no shipping articles and no prescribed voyage stated, the implied contract or legal presumption is that he is to be returned to the port of shipment. The doctrines as to sea-going vessels are well settled, and the principles on which they have been asserted apply to internal navigation, in the absence of any congressional legislation on the subject," and Judge TREAT adds: "It is very easy for officers to state to a mariner, definitely, what his employment is to be, whether to be discharged at the port of arrival or otherwise, if they wish to limit his term of service, or reserve a right to discharge him before his return to the port of shipment." To which I may add that the present case shows the propriety of a written agreement, which would clearly show the understanding of the parties, instead of verbal statements, as claimed by the respondents, but which, on the respondents' own showing, were uncertain and apt to be misunder-

stood. The rule laid down in *Worth* v. *Lioness* was followed and approved by Judge Acheson in this court in the case of *The Hudson*, 8 Fed. Rep. 167.

In the present case the respondents have not undertaken to show that the vessel was prevented from returning to Cincinnati, or that any reason existed which required the discharge of the crew at Pittsburgh. While even that might not relieve the respondents, in the absence of an express contract, from the obligation to return the libelants to Cincinnati, yet it makes the present case stronger against the respondents than either of the cases cited. The respondents in this case assumed they had the right to terminate the service at Pittsburgh because they saw fit to do so. One difference between this case and the cases cited, is that in this case the boat was about to begin her return trip from a foreign to her home port at the time the libelants were hired, and they were discharged at her home port. I am unable to see, though, how that alters or affects the rule laid down in the cited cases. As to those of the libelants whose homes were in Cincinnati, the voyage was to a foreign port. The boat was engaged in the coal trade between Pittsburgh and Cincinnati, and was plying back and forth, as the stage of water permitted. The libelants had a right to assume, in the absence of an express agreement or statement to the contrary, that she would return to Cincinnati. Such being the case, they are entitled to be returned to Cincinnati. They are each, with the exception of Michael Hawkins, entitled to be paid the cost of a railroad ticket to Cincinnati, which, as the undisputed testimony shows, at the date of their discharge, was, by the cheapest route, $8.50; and, as they could have reached Cincinnati by rail within 24 hours from the time of discharge, they are entitled to one day's wages each, at the rate of $40 per month, and are entitled to a decree accordingly, with costs. The libel must be dismissed as to Michael Hawkins.